UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

ESMERALDA RODRIGUEZ,                                     **COMPLAINT**

                                                   **20 cv 4626**

                                                  **ECF Case**

                  Plaintiff,

      vs.

The CITY OF NEW YORK,
DETECTIVE FABIO NUNEZ,
POLICE OFFICER SHANEE HANSLER,
POLICE OFFICER DAVID CALLAN,
and POLICE OFFICERS JOHN DOES 1-5,        **JURY TRIAL DEMANDED**
in their individual and official capacities,

                  Defendants.

------------------------------------------------------------x

Plaintiff Esmeralda Rodriguez, by her attorney, Cyrus Joubin, complaining of the

Defendants, respectfully alleges as follows:

### PRELIMINARY STATEMENT

1.   This action arises from various civil rights violations against

Esmeralda Rodriguez ("Plaintiff" or "Ms. Rodriguez") by New York City police officers

from the 34th Precinct in Upper Manhattan.  Plaintiff asserts constitutional claims

pursuant to 42 U.S.C. § 1983 ("Section 1983") against the individual defendants for false

arrest, excessive force, denial of the right to a fair trial, denial of substantive due process,

failure to intervene, and a *Monell* claim against the City of New York for the same

constitutional violations.  Plaintiff seeks compensatory and punitive damages, costs,

disbursements, and attorney's fees pursuant to applicable state and federal civil rights

law.

## JURISDICTION

2.   This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 and the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343 (a)(3) and (a)(4), this being an action seeking redress for the violation of Plaintiff's constitutional and civil rights.

## VENUE

3.   Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because the acts complained of occurred in this district.

## JURY DEMAND

4.   Plaintiff respectfully demands a trial by jury on each and every one of her claims as pled herein, pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

5.    The individually named defendants Detective Fabio Nunez ("Det. Nunez"), Police Officer Shanee Hansler ("PO Hansler"), Police Officer David Callan ("PO Callan"), and Police Officers John Does 1-5 ("PO Doe 1," "PO Doe 2," etc.) (collectively, the "individual defendants") are and were at all times relevant herein officers, employees and agents of the New York City Police Department ("NYPD").

6.    On the date of the incident giving rise to this complaint, the individual defendants were assigned to the NYPD 34th Precinct.

7.    Each individual defendant is sued in his or her individual and official capacity.  At all times mentioned herein, each individual defendant acted under the color

of state law, in the capacity of an officer, employee, and agent of defendant City of New York ("Defendant City").

8.     Defendant City is a municipality created and authorized under the laws of New York State.  It is authorized by law to maintain, direct, and to supervise the NYPD, which acts as its law enforcement agent and for which it is ultimately responsible.

## STATEMENT OF FACTS

9.     At around 11:30 p.m. on July 14, 2018, Ms. Rodriguez was socializing with some friends and listening to music outside El Mundo Car Dealership ("Mundo"), located at 438 West 206 Street in Upper Manhattan.

10.     Suddenly, two uniformed police officers – Defendants Det. Nunez and PO Hansler – approached Ms. Rodriguez and one of her friends, Tomas Medina ("Mr. Medina").

11.     Defendants Nunez and Hansler demanded Mr. Medina's ID.

12.     Defendants Nunez and Hansler also demanded the ID of Mundo's owner's brother, who was also present.

13.     Ms. Rodriguez and Mr. Medina asked why the officers needed Mr. Medina's ID.

14.     PO Hansler said they needed an ID for the "loud music."

15.     Even after the music was shut off, Nunez and Hansler continued to demand Mr. Medina's ID.

16.     "Why do you want my ID?" Mr. Medina asked.

17.     "Because the police department said that I need an ID.  Now you better give me an ID," Det. Nunez responded.

18.     "No, he don't do nothing wrong," said Ms. Rodriguez (a native Spanish speaker).

19.     "No, I'm asking him now for an ID," Nunez insisted.

20.     During the discussion about providing ID, Mr. Medina walked toward Mundo.

21.     Det. Nunez followed Mr. Medina, grabbed him from behind, and put him in a chokehold.

22.     Mr. Medina's face reddened and he struggled to speak.

23.     "Taser – taser!  I'm going to tase him," said Det. Nunez.

24.     Nunez unholstered his Taser stun gun and began tasering Mr. Medina.

25.     As Nunez physically brutalized Mr. Medina in this unlawful, life-threatening manner – in the course of an unlawful arrest – Ms. Rodriguez approached and pleaded: "Stop, please – stop, please!"

26.     As Ms. Rodriguez pleaded for Det. Nunez to stop, Det. Nunez turned to Ms. Rodriguez, pressed his Taser against her torso, and pulled the trigger.

27.     The Taser's electrical barbs caused a sharp pain and left a pink mark on Ms. Rodriguez.

28.     The physical struggle between Det. Nunez, PO Hansler, and Mr. Medina moved deeper into the Mundo parking lot, where they became sandwiched between parked cars.

29.     Soon a large group of police officers, including PO Does 1-5, arrived and joined the false and brutal arrest of Mr. Medina.

30.     While Ms. Rodriguez begged the officers to stop their violence against Mr. Medina, PO Doe 1 yelled at Ms. Rodriguez to "shut up!" and violently handcuffed her behind her back, yanking and twisting her arms.

31.     Ms. Rodriguez had done nothing unlawful.

32.     Ms. Rodriguez never jumped on Det. Nunez's back.

33.     Ms. Rodriguez never threatened any of the police officers at Mundo.

34.     Ms. Rodriguez never said anything to inflame or encourage the physical struggle between Mr. Medina and the police officers.

35.     Ms. Rodriguez never yelled "Fight!" at Mr. Medina or anyone else.

36.     In fact, Ms. Rodriguez's only wish was for the brutal arrest to stop.

37.     As she stood handcuffed, Ms. Rodriguez grimaced in pain from the tight handcuffs and Taser shot.

38.     The officers did nothing to alleviate the pain of Ms. Rodriguez's handcuffs despite her cries and complaints.

39.     In response to her complaint that the handcuffs "hurt," PO Doe 2 said, "it's supposed to hurt."

40.     Ms. Rodriguez was transported to the 34th Precinct.

41.     To justify their violent and unlawful actions, Det. Nunez and PO Hansler lied about Ms. Rodriguez's conduct as well as the conduct of Mr. Medina.

42.     With respect to Ms. Rodriguez, Det. Nunez and PO Hansler stated that Ms. Rodriguez jumped on Det. Nunez's back while he was arresting Mr. Medina.

43.     Det. Nunez and PO Hansler also stated that during the struggle to arrest Mr. Medina, Ms. Rodriguez yelled "Fight!" at Mr. Medina.

44.     Based on these lies, Ms. Rodriguez was charged with Obstructing Governmental Administration in the Second Degree pursuant to New York Penal Law Section 195.05.

45.     Knowing that Ms. Rodriguez would be prosecuted on the basis of these lies, Det. Nunez and PO Hansler repeated these lies to their fellow officers, including PO Callan.

46.     PO Callan knew the allegations against Ms. Rodriguez – specifically, her alleged jumping on Nunez's back and yelling "Fight!" – were false.

47.     PO Callan had personally observed the conduct of Ms. Rodriguez and Mr. Medina at Mundo.

48.     PO Callan reviewed Det. Nunez and PO Hansler's body camera footage at the 34th Precinct while Ms. Rodriguez's arrest was being processed.

49.      PO Callan helped communicate the allegations that Ms. Rodriguez had jumped on Det. Nunez's back and yelled "Fight!" to the Manhattan District Attorney's Office.

50.     Because of the aforementioned fabrications – namely, Ms. Rodriguez's alleged jumping on Nunez's back and yelling "Fight!" – the Manhattan District Attorney's Office charged Ms. Rodriguez with Obstructing Governmental Administration in the Second Degree, a class "A" misdemeanor.

51.     Because of the aforementioned fabrications, the officers at the 34th Precinct detained Ms. Rodriguez, processed her arrest, and transported her to Central Booking in lower Manhattan, rather than simply issue her a summons or Desk Appearance Ticket.

52.     At her arraignment in New York County Criminal Court on the evening of July 15, 2018, Ms. Rodriguez was charged with Obstruction of Governmental Administration in the Second degree in connection with Docket Number 2018NY029850.

53.     According to the Criminal Court Complaint, Det. Nunez "inform[ed]" PO Callan that on July 14, 2018, at "about 11:45 P.M., in front of 438 West 206 Street," Ms. Rodriguez "jumped on Detective Nunez's back" and yelled "Fight!" at Mr. Medina while Det. Nunez "attempted to arrest" Mr. Medina.

54.     The Criminal Court judge released Ms. Rodriguez on her own recognizance but ordered her to return to Criminal Court on September 20, 2018.

55.     Ms. Rodriguez spent approximately twenty-four hours in custody before her release.

56.     On July 17, 2018, Det. Nunez signed a document called the "supporting deposition" pursuant to New York Criminal Procedure Law Section 100.20, asserting under penalty of criminal prosecution that the allegations in the Criminal Court Complaint were true.

57.     On September 20, 2018, Ms. Rodriguez appeared in New York County Criminal Court.  Because of Det. Nunez's supporting deposition, the complaint was converted to an "information," allowing the prosecution to move forward to trial.

58.     Ms. Rodriguez was ordered to return to Court on October 22, 2018.  On that date, Ms. Rodriguez resolved her prosecution by accepting an Adjournment in Contemplation of Dismissal ("ACD").

59.     Her prosecution was ultimately dismissed and sealed on April 19, 2019.

60.     As a result of the above-described conduct by the individual defendants, Ms. Rodriguez suffered loss of liberty, substantial physical pain, and emotional distress.

**DELIBERATE ACTS UNDER COLOR OF STATE LAW**

61.     All of the aforementioned acts of the individual defendants, their agents, servants and employees, were carried out under the color of state law in the course and scope of their duties.

62.     All of the aforementioned acts deprived Plaintiff of the rights guaranteed by the Fourth, Fifth, and Fourteenth Amendments of the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

63.     The individual defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiff of her constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

**FAILURE TO TRAIN, SUPERVISE, AND DISCIPLINE**

64.     Upon information and belief, the individual defendants' aforementioned abuse of power – in the forms of physical violence and mendacity – was not an isolated event. There were other instances of misconduct by the individual defendants that Defendant City knew or should have known about.

65.     The NYPD failed to supervise and discipline the individual defendants despite their histories of malicious and mendacious behavior, ignoring the risk that they would engage in future misconduct, thereby encouraging them to continue to abuse their powers and violate the rights of civilians.

66.     For instance, as referenced in the October 10, 2019 Complaint in Medina v. City of New York, et al., 19 cv 9412 (AJN) (ECF No. 1) (the "Medina Complaint"), the

City repeatedly failed to discipline Det. Nunez despite his 37 allegations of misconduct reported to the CCRB and multiple incidents of excessive force, resulting in settlement payments of more than $220,000 by the City.  Despite this history, Det. Nunez was promoted to Detective in 2015 and became a Neighborhood Coordination Officer.

**NYPD'S CULTURE OF MENDACITY**

67.     There is a systemic failure by the City to identify, discipline, and supervise NYPD officers who fabricate criminal charges, a failure so widespread, obvious, and tolerated as to constitute a custom and policy of Defendant City.

68.     The NYPD's flaccid response to lying officers – particularly in the context of filing false charges – constitutes a destructive custom and policy that fosters a culture of mendacity in the NYPD.

69.     The City has recognized the obvious and significant problem of police officers fabricating criminal charges, but there is no serious mechanism in place by which to curb such conduct or weed out dishonest officers.

70.     Proportionate and appropriate discipline sends a message to NYPD officers that they are not above the law and are accountable to the people whom they serve.

71.     But NYPD officers usually face only minor discipline or no discipline whatsoever for making false statement on court documents.

72.     The Civilian Complaint Review Board ("CCRB") has no jurisdiction to investigate allegations of fabricated statements by NYPD officers in criminal court documents.  Investigating, controlling, and punishing this type of wrongdoing is the responsibility of the NYPD.

**THE NYPD'S SHAM FALSE STATEMENT POLICY**

73.     In 1995, by Executive Order No. 18, Defendant City's Mayor created the Commission to Combat Police Corruption (the "Commission") to monitor and evaluate the NYPD's anti-corruption activities.  The Commission fulfills its mandate to monitor the NYPD's performance by reviewing the investigations of the Internal Affairs Bureau ("IAB"), and presenting its findings in its Annual Report.

74.     Since its inception, the Commission has emphasized the importance of appropriately disciplining officers who make false statements.  On the basis of the Commission's recommendations, the NYPD has adopted a False Statement Policy (*see* NYPD Patrol Guide Section 203-08) that mandates termination of officers who intentionally make false official statements regarding a material matter, unless exceptional circumstances exist.

75.     As the Commission stated in its 2013 Annual Report, "Consistent application of the false statement policy is of utmost importance.  It not only enables members of the service to know what they can expect if they make false statements, but it also sends a clear message to members of the service, as well as the public, that the Department will not tolerate such conduct" (pg. 74).

76.     The Commission analyzes false statements in official criminal court documents, including supporting depositions, criminal court complaints, summonses, and affidavits.  False statements in such documents are of paramount importance because they have the potential to unjustly deprive persons of their civil liberties and to destroy the lives of innocent people.

77.     Despite the importance of appropriately identifying and punishing officers who make false statements, the NYPD rarely imposes discipline consistent with its stated

policy of terminating officers.

78.     Indeed, the gap between its practice and policy is so wide as to make the NYPD's False Statement Policy a sham.

79.     For example, in the 2014 Annual Report, the Commission examined ten cases involving false statements in sworn court documents; in seven of those cases, the subject officers were found guilty by making false statements but not separated from the police department.

80.     Such findings – which expose the gap between the NYPD's False Statement Policy and practice – can be found in virtually every Annual Report issued by the Commission.

81.     Over the past ten years, in its Annual Reports, the Commission has analyzed numerous forms of false statements and has consistently found that the NYPD "fail[s] to follow its false statement policy"; "fail[s] to charge the subject officer with making a false statement although such a charge appear[s] appropriate"; levies "other similar charges…to avoid the imposition of the False Statement Policy's requirement of termination"; and creatively, and without justification, skirts the requirement of termination.

82.     And there is no sign of improvement.  Indeed, under Mayor de Blasio's administration, the NYPD seems more empowered than ever to thumb its nose at the False Statement Policy.

83.     In its 2015 Report, the Commission found that the NYPD rarely brought charges under the False Statement provision.  "Instead," the Commission reports, "the Department used other Patrol Guide sections to allege misconduct relating to false

statements" (pg. 103) – sections which do not carry a presumption of termination.

84.     The Commission's 2017 Report found that the NYPD has been charging officers with making false official statements in far fewer instances than facts and circumstances seem to warrant.

85.     In the specific context of fabricated court documents that falsely accuse people of wrongdoing, the Commission has regularly found grossly inadequate punishments, resulting in guilty officers forfeiting vacation days (usually no more than 30 days) but rarely losing their jobs.

86.     To make matters worse, the instances of false statements investigated by the IAB and analyzed by the Commission compose a small fraction of the total instances of false statements that occur within the NYPD.

87.     In the 2010 Annual Report, for instance, the Commission identified only ten IAB cases that included allegations of making an official false statement.

88.     The officers who were caught fabricating statements were unlucky – they were captured on videotape, a civilian reported them, their lies were unwittingly exposed – but most dishonest police officers know they can lie and get away with it.

 **"TESTILYING"**

89.     On March 18, 2018, the New York Times published an article by Joseph Goldstein called "'Testilying' by Police:  A Stubborn Problem," detailing the pervasive and largely ignored problem of police perjury.  "Behind closed doors, we call it testilying," said NYPD officer Pedro Martinez in an interview for the article.

90.     The article states:  "An investigation by the New York Times found that on more than 25 occasions since January 2015, judges or prosecutors determined that a key

aspect of New York City police officer's testimony was probably untrue.  The Times identified these cases – many of which are sealed – through interviews with lawyers, police officers and current and former judges."  Moreover, "[t]he 25 cases identified by The Times are almost certainly only a fraction of those in which officers have come under suspicion for lying in the past three years."  "Still, the cases identified by The Times reveal an entrenched perjury problem several decades in the making that shows little sign of fading."  The purpose of the perjury was "aimed at tilting the scales toward guilt."

**NYPD PROTECTS AND PROMOTES LYING OFFICERS**

91.    On March 19, 2018, the New York Times published another article by Joseph Goldstein entitled "Promotions, Not Punishments, for Officers Accused of Lying," reiterating the findings of the Commission and detailing a "culture of dishonesty."

92.    The article states:  "Of the 81 cases in which a civilian review board [the CCRB] found an officer had lied, the Police Department pursued 'false statement' charges in only two."  In the other 79 cases, the NYPD found no wrongdoing or found the officer guilty of lesser misconduct.

93.    The article also notes a problem with transparency and accountability when it comes to the NYPD's false statement policy:  the NYPD is not required to tell the CCRB if it takes action against lying police officers.  Thus, while the CCRB is aware of the 81 cases it has tracked since 2010, it – along with the public at large – is oblivious to the total number of cases in which officers have been found to lie and what their punishments are.

94.    So while the NYPD may publicly extol its professionalism and integrity

control, the NYPD cannot be trusted.  Its indifference to truthfulness by its own rank and

file – coupled with a lack of full transparency about how it handles lying officers – makes

the department as a whole unworthy of trust.

95.     The NYPD's indifference to officer mendacity is evidenced by Det. Nunez's

career.  As discussed in the Medina Complaint, on May 29, 2009, Det. Nunez gave

contradictory testimony during a suppression hearing.  The Manhattan DA's Office

admitted that "[t]here is credible evidence which tends to contradict some of Defendant

Nunez's hearing testimony."  The NYPD did not investigate Det. Nunez's testimony, and

Det. Nunez did not face any adverse employment consequence for making false

statements in court.  More recently, in his CCRB testimony, Det. Nunez denied putting

Mr. Medina in a chokehold even though the surveillance videos clearly show that he did

put Mr. Medina in a chokehold.  Upon information and belief, Det. Nunez has not faced

any adverse employment consequence for having made this false statement to the CCRB.

**FAILURE BY THE CITY TO FIX THE CULTURE OF MENDACITY**

96.     Defendant City has turned a blind eye to the tens of thousands of criminal

cases which are dismissed each year in the Criminal and Supreme Courts of Defendant

City; has failed to study how many of those dismissals were due to baseless, fabricated

charges; and has failed to proactively look for patterns of fabrication and identify charges

that should have never been brought.

97.     Defendant City has no system by which to proactively identify mendacious

officers.

98.     In response to the "Testilying" phenomenon, for example, the City has failed

to create any system for how prosecutors should document and keep track of internal

evaluations of officer dishonesty. *See* "When Prosecutors Bury NYPD Officers' Lies" (*Gothamist*), by George Joseph and Ali Winston (Sept. 17, 2019) ("Interviews with more than a dozen former prosecutors from Brooklyn, the Bronx, Queens, Staten Island, and Manhattan DA's offices, disclosure letters from the Manhattan DA's office, and a review of numerous cases suggests internal systems to track police misconduct are haphazard at best, and intentionally negligent at worst.").

99.     In the ten years prior to July 14, 2018, the number of NYPD investigations into police officers making false statements on criminal court accusatory instruments that did not arise from civilian complaints was *zero*.

100.     In a criminal justice system where numbers and statistics have become paramount, the inadequacy of the NYPD's supervision and discipline with respect to dishonesty in the filing of criminal charges is exacerbated by the pressure on police officers to meet arrest quotas, or "performance goals."

101.     Because arrests are rewarded, while making false arrests and fabricating charges go largely unpunished, police officers have felt incentivized to engage in false arrests and to fabricate criminal charges.

102.     Such perverse incentives become particularly destructive in the hands of dishonest, undisciplined, unsupervised officers, such as the individual defendants.

103.     Through the data cited herein along with hundreds of civil rights lawsuits alleging fabrication every year, the policymakers of Defendant City have been aware of the NYPD's practice of insufficiently punishing – and thereby encouraging – the fabrication of criminal charges.

104.     By doing nothing about this practice, the City has demonstrated deliberate indifference to the rights of its residents.

105.     The notion of police officers lying, cheating, fabricating, manipulating, and misleading has become so accepted and commonplace within the NYPD that the pursuit of justice has become subverted and degraded.  Police officers must operate in a police culture so truth-sick and cynical that their morale and morality are crushed.  NYPD officers see firsthand how roguish and dishonest behavior is rewarded within their ranks. The negative incentives created by this sick culture threaten the safety, welfare, and liberty of every resident.

**DAMAGES**

106.     As a direct and proximate cause of the said acts of the Defendants, Plaintiff suffered the following injuries and damages:

    a.  Violation of her constitutional rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution;

    b.  Physical injury;

    c.  Emotional trauma, distress, degradation, and suffering.

**SECTION 1983 CLAIMS**

**FIRST CLAIM**

**Substantive Due Process Under Section 1983**

107.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

108.    By the actions described, the Defendants deprived Plaintiff of her Fourteenth Amendment right to substantive due process.

109.    By shooting his Taser stun gun while pressing it into Plaintiff's body, Det. Nunez engaged in conduct that shocks the conscience.

110.    As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged.

## SECOND CLAIM

### Denial of the Right to a Fair Trial Under Section 1983

111.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

112.    By the actions described, the Defendants deprived Plaintiff of her Fourth, Fifth, and Fourteenth Amendment rights to a fair trial.

113.    The individual defendants deliberately forwarded fabricated information to the Manhattan District Attorney's Office.

114.    As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged.

## THIRD CLAIM

### Excessive Force Under Section 1983

115.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

116.    By the actions described, the individual defendants deprived Plaintiff of her Fourth Amendment right to be free of unreasonable or unwarranted restraints on personal liberty, specifically her right to be free from excessive and unreasonable force.

117.    As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged.

## FOURTH CLAIM

### False Arrest Under Section 1983

118.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

119.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

120.    By the actions described above, Defendants deprived Plaintiff of her federal civil rights, including her Fourth Amendment right to be secure in her person against unreasonable searches and seizures, specifically her right to be free from false arrest.

121.    As detailed above, the individual defendants intentionally arrested and detained Plaintiff without probable cause, without a warrant, without privilege or consent.

122.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

## FIFTH CLAIM

### Failure to Intervene Under Section 1983

123.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

124.    Each and every individual defendant had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of her constitutional rights by other law enforcement officers.

125.    The individual defendants failed to intervene on Plaintiff's behalf to prevent, end, or truthfully report the violations of her constitutional rights despite knowing about such violations and having had a realistic opportunity to do so.

126.    As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged.

## SIXTH CLAIM

### Municipal Liability Under Section 1983

127.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

128.    By the actions described, the Defendant City deprived Plaintiff of her Constitutional rights through its failure to train, supervise, and discipline malicious and mendacious officers; and through its indifference to a culture of dishonesty among those who wield considerable power over the lives of everyday residents.

129.    As a direct and proximate result of the acts of Defendant City, Plaintiff sustained the other damages and injuries hereinbefore alleged.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands the following relief jointly and severally against the Defendants:

a.    An order awarding compensatory damages for Plaintiff Esmeralda Rodriguez in an amount to be determined at trial;

b.    An order awarding punitive damages in an amount to be determined at trial;

     c.      A court order, pursuant to 42 U.S.C. § 1988, that Plaintiff is

            entitled to reasonable attorney's fees, costs and disbursements; and

     d.      Such other and further relief as this Court may deem appropriate.


DATED:     June 16, 2020              _____/s/_____
            New York, New York      CYRUS JOUBIN, ESQ.
                                     43 West 43rd Street, Suite 119
                                     New York, NY 10036
                                     (703) 851-2467
                                     joubinlaw@gmail.com
                                     Attorney for Esmeralda Rodriguez